**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ANN M. GAVIN, | : | CIVIL ACTION NO. 10-3140 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| AT&T SERVICES, INC., et al., | : | |
| | : | |
| Defendants. | : | |

**COOPER, District Judge**

Plaintiff, Ann M. Gavin ("Plaintiff"), brought this action against defendants, AT&T Services, Inc. ("AT&T"), Lori Smith ("Smith"), and Diane Bradley ("Bradley") (collectively, "Defendants"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq. (Dkt. entry no. 1, Compl.) Plaintiff alleges that she suffered from "multiple impairments in her feet and legs . . . [that] adversely affected her mobility," and that Defendants should have accommodated this disability by allowing Plaintiff to telecommute to her job. (Compl. at ¶¶ 15, 28.)

Defendants move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 16.) Plaintiff opposes the motion. (Dkt. entry no. 18, Pl. Br.)

The Court now considers the motion without oral argument, pursuant to Local Civil Rule 78.1(b). The Court, for the reasons stated herein, will grant the motion.

## BACKGROUND

### I.   Plaintiff's Employment at AT&T

Plaintiff's employment at AT&T began in 1984, and she started working in the Labor Relations Department in 1990. (Compl. at ¶ 9; dkt. entry no. 16, Rosenblatt Cert., Ex. A, Pl. Dep. at 18:1-14.) Plaintiff was outsourced to Aon Human Capital in 2002, and re-hired by AT&T in December 2007 as a Senior Labor Relations Manager. (Compl. at ¶ 9; Pl. Dep. at 18:20-19:6, 24:1-5.) Plaintiff worked at AT&T's office in Bedminster, New Jersey ("Bedminster facility"). (Compl. at ¶ 10.) Plaintiff's direct supervisor was Smith, who works from a virtual home office in North Carolina. (Id. at ¶ 11; Pl. Dep. at 37:16-21.)[1] Bradley was Smith's direct supervisor and worked at the Bedminster facility. (Id. at ¶ 12.)

Plaintiff signed an employment application in association with her re-hiring in 2007. (Rosenblatt Cert., Ex. D, Employment Application.) The Employment Application includes a "Waiver of Statute of Limitations for Employment-Related Claims" that reads:

---

[1] Smith was authorized, pursuant to corporate policy, to work from a virtual home office in North Carolina sometime prior to 2006 when her spouse was relocated and AT&T did not have a facility for Smith to work out of in that area. (Rosenblatt Cert., Ex. S, Bradley Dep. at 31:2-32:13.)

2

> READ CAREFULLY - WAIVER OF STATUTE OF LIMITATIONS FOR
> EMPLOYMENT-RELATED CLAIMS . . . I AGREE THAT, EXCEPT
> FOR CHARGES OR CLAIMS FILED WITH THE U.S. EQUAL
> EMPLOYMENT OPPORTUNITY COMMISSION OR UNDER ANY OF THE
> STATUTES ENFORCED BY THAT AGENCY, ANY CLAIM OR LAWSUIT
> RELATING TO MY EMPLOYMENT (INCLUDING MY APPLICATION FOR
> EMPLOYMENT OR TERMINATION OF EMPLOYMENT) AT ANY TIME
> WITH [AT&T] MUST BE FILED WITHIN SIX (6) MONTHS OF THE
> DATE I LEARN OF, OR COULD HAVE LEARNED OF BY REASONABLE
> DILIGENCE, THE ADVERSE ACTION, EVENT, OR OMISSION THAT
> I SEEK TO CHALLENGE, OR IT SHALL BE TIME-BARRED (I.E.,
> I GIVE UP THE RIGHT TO BRING SUCH CLAIM OR LAWSUIT).
> THIS WAIVER APPLIES TO ALL EMPLOYMENT-RELATED CLAIMS
> OTHER THAN EEOC CLAIMS, INCLUDING CLAIMS UNDER (1) 42
> U.S.C. § 1981, THE EQUAL PAY ACT, THE FAIR LABOR
> STANDARDS ACT, THE FAMILY AND MEDICAL LEAVE ACT, AND
> THE EMPLOYEE RETIREMENT INCOME SECURITY ACT, (2) ANY
> STATE OR LOCAL LAW GOVERNING EMPLOYMENT, COMPENSATION,
> DISCRIMINATION, OR RETALIATION, AND (3) THE COMMON LAW
> OF ANY STATE. . . . I EXPRESSLY WAIVE ANY STATUTE OF
> LIMITATIONS THAT MIGHT OTHERWISE PROVIDE FOR A LONGER
> PERIOD OF TIME IN WHICH TO BRING SUCH CLAIM OR LAWSUIT.
> I FURTHER AGREE THAT THIS WAIVER SHALL BE GOVERNED BY
> AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE
> OF ILLINOIS.  I UNDERSTAND THAT IF ANY PART OF THIS
> WAIVER PROVISION IS DEEMED ILLEGAL OR UNENFORCEABLE,
> SUCH PART SHALL HAVE NO FORCE OR EFFECT, BUT ITS
> ILLEGALITY OR UNENFORCEABILITY SHALL HAVE NO EFFECT
> UPON, AND SHALL NOT IMPAIR THE ENFORCEABILITY OF, ANY
> OTHER PARTS OF THIS WAIVER PROVISION.

(Employment Application at No. 2341 (the "SOL Waiver").)

Plaintiff signed the Employment Application directly below the

paragraph containing the SOL Waiver and dated it 9-12-07.  (Id.)

Plaintiff's position as a senior labor relations manager was

a "level one" administrative support role that did not involve

managing anyone.  (Pl. Dep. at 23:25-24:21.)  Her work was

performed sitting at a desk and involved talking on the phone;

travel was not required.  (Pl. Dep. at 25:6-26:3.) At the
Bedminster facility, it took Plaintiff approximately ten minutes
to walk between the parking lot and her desk, and she also walked
short distances between her desk and the ladies' room, to eat
lunch in the office next to her desk, and sometimes to take the
elevator to the cafeteria to get something to eat.  (Pl. Dep. at
26:9-32:19.)  She did not have to do any other walking to perform
her job duties.  (Pl. Dep. at 34:3-6.)

    Plaintiff alleges that she telecommuted in her position off
and on, beginning around March 31, 2008.  (Compl. at ¶ 26; <u>see</u>
<u>infra</u> Part III (discussing telecommuting request history); <u>see</u>
<u>also</u> Pl. Dep. at 146:1-13 (stating Plaintiff may have been
telecommuting as early as February).)  Plaintiff alleges that on
or around June 10, 2008, "AT&T's agents systematically and
repeatedly denied Plaintiff's requests to continue to telecommute
as a reasonable accommodation" for knee and foot impairments.
(Compl. at ¶ 28.)  Plaintiff was out sick for reasons unrelated
to her knee and foot ailments from August 25, 2008, to September
2, 2008.  (Pl. Dep. at 58:21-59:3; Rosenblatt Cert., Ex. P, 8-26-
08 Email from Gavin to Smith.)  On September 2, 2008, Plaintiff
asked Bradley if she could work from home in order to help
improve her knee function.  (Compl. at ¶ 40 & <u>id.</u>, Ex. V, EEOC
ADA Intake Questionnaire ("EEOC Questionnaire") at 6.)  Bradley
apparently had Smith take up the matter with Plaintiff later that

day.  (EEOC Questionnaire at 6.)  Plaintiff then "asked [Smith] about telecommuting as an accommodation," but was refused.  (Pl. Dep. at 205:13-206:25.)  Plaintiff was "distraught" and resigned her position that day.  (EEOC Questionnaire; Pl. Dep. at 269:12-25.)

## II.  Plaintiff's Alleged Disability

Plaintiff alleges that she has a disability, namely, knee and foot pain caused by a stress fracture to her right knee, psoriatic arthritis, and pustular psoriasis on her heel, all of which she claims interfere with her ability to engage in the "major life activity" of walking.  See 42 U.S.C. § 12102. (Compl. at ¶¶ 15-24; see also Pl. Dep. at 103:5-11 (stating that she had a swollen knee caused by psoriatic arthritis and pustular psoriasis on her left foot, both of which caused pain while walking).)

Plaintiff alleges that her knee pain began in February 2007, and that as of February 2008, she "continued to experience severe discomfort, aching pain, and swelling in her right knee." (Compl. at ¶¶ 15, 18.)  Plaintiff was treated for this knee pain, and on March 31, 2008, was diagnosed as having a stress fracture and prescribed crutches for six weeks.  (Compl. at ¶¶ 18-21; Pl. Dep. at 103:17-22, 110:22-24; Rosenblatt Cert., Ex. G, Bouillon 3-31-08 Progress Note.)  At the end of this six-week period, swelling of the knee persisted, but Plaintiff did not complain of

5

pain to her doctor.  (Rosenblatt Cert., Ex. H, Bouillon 5-12-08 Progress Note; Pl. Dep. at 104:1-17 (stating that after she got off the crutches, Plaintiff's knee "kept swelling" and she "had to keep getting it tapped," and the knee swelling only limited her in walking, but she was still able to walk).)  At her next appointment, Plaintiff again reported that she "really has no knee pain as such," had been walking without crutches, and that the swelling still persisted.  (Rosenblatt Cert., Ex. I, Bouillon 6-5-08 Progress Note.)

Plaintiff saw a rheumatologist, Dr. Golombek, on June 11, 2008.  (Rosenblatt Cert., Ex. L, 6-11-08 Letter from Golombek to Bouillon.)  Dr. Golombek stated that (1) Plaintiff was being seen for "right knee swelling," (2) Plaintiff "has only had mild pain and does not have major stiffness," (3) a two year history of psoriasis affected Plaintiff's hands and feet, (4) "we elected to aspirate and inject the knee," and (5) Plaintiff expressed a preference to pursue "alternative treatments" (with an "alternative doctor" who prescribed Plaintiff "herbs and stuff") rather than a "disease modifying agent," should her psoriatic arthritis persist.  (Id.; Pl. Dep. at 106:21-25.)  At an appointment with Dr. Bouillon on July 1, 2008, Plaintiff was "feeling better with occasional discomfort in her knee" and had "done pretty well with cortisone shot."  (Rosenblatt Cert., Ex. M, Bouillon 7-1-08 Progress Note.)

Plaintiff was diagnosed on April 9, 2008, with pustular psoriasis of the left heel, a condition causing "Plaintiff's left heel to be covered with blisters that oozed, bled and itched." (Compl. at ¶ 22.)  As of August 11, 2008, Plaintiff was still suffering from recurrent stiffness and soreness in the right knee from psoriatic arthritis.  (Compl. at ¶ 24.)

## III. Work Attendance and Telecommuting Requests

Plaintiff alleges that before she was re-hired by AT&T in December 2007, she inquired about the possibility of telecommuting.  (Compl. at ¶ 13.)  Plaintiff stated at her deposition that the reason she asked about this was solely because she "[didn't] like to drive in the snow."  (Pl. Dep. at 49:19-25.)  Plaintiff testified that Bradley told Plaintiff that "upper management didn't appreciate it or like it to be done," but the company would "work with" Plaintiff in situations such as doctor's appointments or inclement weather, which Plaintiff understood to mean that if she "needed to telecommute, it wouldn't be a problem."  (Pl. Dep. at 50:1-11.)

Plaintiff spoke to Smith about the possibility of telecommuting in January 2008 because she "just wanted to know how [Smith] felt about it."  (Pl. Dep. at 78:21-25.)  Plaintiff inquired about telecommuting because she felt it was more convenient to telecommute than to travel to the office, and not for any other reason.  (Pl. Dep. at 79:1-5.)  The record

indicates that beginning on February 4, 2008, Plaintiff telecommuted on a daily basis.  (Dkt. entry no. 16, Bradley Cert., Ex. A, Summary of Time Data Report.)  Plaintiff testified that she had not been given express permission by Smith to telecommute, and that Plaintiff did not tell Smith she was telecommuting.  (Pl. Dep. at 115:15-116:3.)

Plaintiff first told Smith about her knee problems on June 10, 2008, and the psoriasis on her heel on July 29, 2008.  (Pl. Dep. at 128:25-129:2, 130:4-7, 172:25-173:6.)  During the June 10, 2008 telephone conversation between Plaintiff and Smith, Smith asked Plaintiff how much Plaintiff had been telecommuting, and Plaintiff explained that she had a stress fracture in her knee and until recently had been on crutches.  (Pl. Dep. at 144:1-8.)  Plaintiff told Smith that she had been telecommuting since March 31, 2008, though she admitted at her deposition that she may have actually been telecommuting since as early as February 2008.  (Pl. Dep. at 146:4-13.)  Plaintiff further explained that her doctor had recommended that Plaintiff continue telecommuting for four more weeks, and Smith apparently gave permission for Plaintiff to do so.  (Rosenblatt Cert., Ex. K, Email from Gavin to Smith and Dr. Bouillon Note (stating that Plaintiff "will be able to return to work in approximately 4 wks."); Pl. Dep. at 145:16-24.)  However, Smith advised Plaintiff

that Smith wanted Plaintiff to stop telecommuting and work in the
office after the four-week period.  (Pl. Dep. at 146:18-21.)

During this conversation, Smith suggested that Plaintiff
look into getting a closer parking spot at the Bedminster
facility.  (Pl. Dep. at 147:6-14.)  Plaintiff testified at her
deposition that Smith also asked whether Plaintiff was going to
go out on disability, to which Plaintiff responded that she would
if she had to come into the office.  (Pl. Dep. at 146:23-147:2.)
Plaintiff never inquired about a closer parking space, although
it would have reduced the amount of time she had to walk in order
to attend work at the Bedminster facility.  (Pl. Dep. at 147:15-
16, 148:2-14.)

Plaintiff stated at her deposition that during the relevant
time period, she sometimes had pain while driving, but she never
told anyone at AT&T that she was having driving problems because
of her knee.  (Pl. Dep. at 108:9-109:3.)  Other than the four-
week period beginning June 10, 2008, during which Plaintiff
telecommuted at her doctor's recommendation and with Smith's
permission, at no time did Plaintiff's ailments affect her
ability to do her job.  (Pl. Dep. at 75:19-76:24.)

Plaintiff was cleared to return to work on July 1, 2008,
without any limitations.  (Pl. Dep. at 160:13-18.)  She did not
advise Smith of any continuing problems with her knee after she
returned to work until sometime in August, and though she

9

continued to require occasional draining of her swollen knee, the draining did not prevent Plaintiff from coming into the office, and Plaintiff did not tell Smith that it would.  (Pl. Dep. at 161:4-162:20.)

Plaintiff worked in the office at the Bedminster facility from July 2, 2008, until she called out sick with the chicken pox on August 25, 2008, with the exception of three days' bereavement leave.  (Pl. Dep. at 168:20-169:17; but see Pl. Dep. at 171:9-172:18 (stating that Plaintiff could not remember how many days between July 2 and July 29 she worked from home, but that she must have worked from home on July 29, because Smith called Plaintiff at home in order to conduct a performance review).) During this time, Plaintiff did not have any conversations with Smith about her ability to come into the office for work, with the exception of an exchange regarding an August 11, 2008 medical appointment, discussed below.  (See infra at 12; Pl. Dep. at 169:18-24; but see Pl. Dep. at 172:2-24 (stating that Smith "br[ought] up the fact that [Plaintiff was] working from home again" in a July 29, 2008 telephone conversation, and expressed that "it made [Smith] look bad in front of [Bradley]").) Plaintiff apparently told Smith during the July 29, 2008 telephone conversation that (1) she had pustular psoriasis on her left foot, and (2) if she did go into the office, she is "not working a lot of overtime because the foot hurts and it is

uncomfortable.  And that's . . . about [all] that I said."  (Pl.
Dep. at 172:25-173:6, 173:10-20.)  She did not bring up the knee
ailment at all.  (Pl. Dep. at 174:10-12.)

The performance review conducted by Smith of Plaintiff on
July 29, 2008, resulted in a generally positive review.  (Pl.
Dep. at 175:3-10.)  The two areas identified for development were
"effective communication" and "expanded knowledge of business
environment."  (Pl. Dep. at 175:22-176:2.)  The need for
"effective communication" referred to the fact that Smith did not
know Plaintiff had been telecommuting.  (Pl. Dep. at 176:3-7.)

Plaintiff stated in an EEOC questionnaire that she did not
need to telecommute in order to do her job.  (Rosenblatt Cert.,
Ex. J, EAS Questionnaire at 1058 (checking "no" in response to
question, "Did you need this assistance or change in working
condition in order to do your job?").)  Also, at some point after
she was re-hired at AT&T, Plaintiff applied for an administrative
position at a different company because she felt like she was
being harassed by Smith by Smith's "insisting that [Plaintiff] be
in the office all the time," but that position did not involve
telecommuting and would have required that Plaintiff work in an
office.  (Pl. Dep. at 176:25-177:23.)

Following the July 29, 2008 phone call, Smith asked
Plaintiff to submit weekly schedules via email.  (Pl. Dep. at
178:15-179:5.)  While Plaintiff did not have a problem with being

asked to submit weekly schedules, she felt that she was being singled out or discriminated against insofar as Smith did not ask other employees to do the same.  (Pl. Dep. at 179:4-19.)  In a weekly schedule email, Plaintiff advised Smith of her intention to telecommute on August 5, 2008, because she was having blood drawn in advance of an August 11, 2008 medical appointment. (Rosenblatt Cert., Ex. N, 8-4-08 Email from Gavin to Smith; Pl. Dep. at 178:16-22.)  Smith asked Plaintiff to come into work after the lab work was complete, rather than telecommute.  (Pl. Dep. at 178:23-179:3.)  Plaintiff admitted that there was no medical reason why she could not come into work after the appointment.  (Pl. Dep. at 182:19-24.)

Plaintiff had a doctor's appointment on August 11, 2008, and advised Smith via email on August 8, 2008 that she intended to telecommute following the early-morning appointment.  (Rosenblatt Cert., Ex. O, Gavin-Smith Email Chain.)  Smith responded by asking whether there was any reason Plaintiff could not come to the office after the appointment.  (Id.)  Plaintiff wrote, "No, just that it seems more productive if I telecommute so I'm not wasting hours traveling."  (Id.)  Smith replied, "As we have discussed previously, I would like you to come to the office every day unless there are extenuating circumstances that we discuss in advance.  Based on the appointment being first thing in the morning, you should plan on coming to the office following

12

your Doctors appointment." (Id.) Plaintiff confirmed at her deposition that the reason she asked to telecommute that day was so she would be more productive, not because of her knee or foot. (Pl. Dep. at 184:7-15, 185:4-9.)

Plaintiff called out sick on August 25, 2008, because she had a rash all over her body and a fever. (Pl. Dep. at 192:18-193:11.) The following day, Plaintiff emailed Smith to provide an "update of [Plaintiff's] health issues" and advise that she was still running a low-grade fever. (Rosenblatt Cert., Ex. P, 8-26-08 Email from Gavin to Smith.) Plaintiff stated that she had been to the rheumatologist and gotten her knee tapped, and that the doctor wanted Plaintiff to start taking a chemotherapy drug for her arthritis. (Id.) Plaintiff stated: "If I really do have a bug, I don't want to spread my germs in the office. I have [work to do] so if it's OK with you, I'll work on it from home today, if not I'll ask Stephanie to code me a sick day." (Id.) Smith responded, "I am sorry you are still not feeling better - I would like you to concentrate on getting better so I will tell Stephanie to code you out sick again today." (Id.)

Plaintiff was diagnosed with chicken pox. (Pl. Dep. at 187:6-15.) On August 28, 2008, Plaintiff wrote an email to Smith stating: "I went to the Dr. last night and I have a virus. The Dr. recommended that I not go into the office but said if needed, I can work from home. Attached is a note from the Dr. Let me

know if you want me to work from home." (Rosenblatt Cert., Ex.
Q, 8-28-08 Email from Gavin to Smith.)   The doctor's note stated,
"The . . . patient has an acute viral syndrome & not be at the
work place.  She may work at home as needed.  May return to work
on Tuesday, Sept. 2 if better." (Id.; Pl. Dep. at 197:8-12.)
Smith responded:

> I am sorry you are still not feeling well, but no, you
> are not authorized to work at home.  I will have
> Stephanie code you out sick again today.  Please let me
> know when you will be able to return to work.  You will
> need to call into the IDSC (Disability Center) to
> initiate your claim for disability. . . . Your eighth
> calendar day will be on Monday and since that is a
> holiday - I would suggest that you call them either
> today or Friday to initiate the process.  Concentrate
> on getting better and let me know if you need anything.

(Id.)[2]

Plaintiff elected not to pursue short-term disability
benefits and returned to work on September 2, 2008.  (Pl. Dep. at
59:2-6.)  Plaintiff spoke to Bradley that morning and asked if
she could report to a different director than Smith.  (Pl. Dep.
at 56:3-7.)  Bradley said no.  (Pl. Dep. at 56:11-14.)  Plaintiff
then informed Bradley for the first time of her foot and knee
problems, and asked if she could telecommute, stating that she
did not want to go out on disability.  (Pl. Dep. at 56:14-17,

---

[2] AT&T's Integrated Disability Service Center administers AT&T's
Short Term Disability Plan, which provides employees with
absences of longer than eight consecutive calendar days with
benefits including income replacement.  (Rosenblatt Cert., Ex. R,
Disability Guide; Pl. Dep. at 69:1-7.)

58:11-14; Rosenblatt Cert., Ex. S, Bradley Dep. at 36:18-37:19.)
Bradley told her that "maybe [she] could telecommute two or thee
times a week and get a closer parking spot," and that she would
talk to Smith about it.  (Pl. Dep. at 56:19-21.)  Plaintiff
proceeded to work for a few hours.  Plaintiff then had a
conversation with Smith, in which she advised Smith that she had
been "locked out" of the system.  (Pl. Dep. at 205:10-18.)  At
this point, Plaintiff did not know whether Bradley had discussed
the telecommuting issue with Smith.  (Pl. Dep. at 56:25-57:2,
57:14-16.)

        Plaintiff asked Smith if it would be all right for her to
telecommute.  (Pl. Dep. at 205:20-21.)  Smith said no.  (Pl. Dep.
at 205:21.)  Plaintiff responded by saying, "I am gonna have to
resign."  (Pl. Dep. at 205:21-22.)  This exchange constituted the
entire conversation.  (Pl. Dep. at 206:11-25.)  Plaintiff
resigned because Smith would not allow her to telecommute, and
she feared that "if [she] had to keep coming into the office with
the knee swollen, . . . it would further damage it."  (Pl. Dep.
at 207:9-21.)  Plaintiff never spoke with Bradley to determine
whether Bradley had talked to Smith about telecommuting.  (Pl.
Dep. at 207:7-9, 214:16-21.)

## IV.  Parties' Arguments

        Defendants contend that they are entitled to judgment in
their favor on the NJLAD claims on the basis that they are time-

15

barred, pursuant to the six-month limitations period contained in the Employment Application governing such claims.  (Dkt. entry no. 16, Defs. Br. at 2.)  They also contend that they are entitled to judgment in their favor on the ADA claims because Plaintiff did not suffer from a "disability" as defined by the ADA during her employment.  (Id.)  They alternatively argue in support of the motion, with respect to both the ADA and NJLAD claims, that Plaintiff was reasonably accommodated and not treated differently from any similarly situated person.  (Id.) Defendants argue that Plaintiff cannot prevail on a claim of constructive discharge because she was not subjected to intolerable working conditions, but voluntarily chose to resign her position.  (Id.)  Finally, Defendants contend that neither Smith nor Bradley may be held liable, either individually or for aiding and abetting.  (Id.)

Plaintiff responds that the six-month limitations period relied on by Defendants is not enforceable; that Defendants exercised bad faith in the accommodation process, precluding summary judgment; and that genuine issues of material fact exist with respect to her constructive discharge claim.  (Dkt. entry no. 18, Pl. Br. at 1.)

**DISCUSSION**

## I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

## II.  Enforceability of SOL Waiver

The parties dispute whether the SOL Waiver contained in the Employment Application constitutes an enforceable contractual provision.  Citing the tenet that contracts must be read as a whole, Plaintiff relies upon paragraph 3 of the Employment Application, which states that "Nothing in this Employment Application . . . is intended to create or does create an employment contract between the Company" and the applicant.  (Pl. Br. at 4.)  Plaintiff contends that the SOL Waiver "is indisputably related to Plaintiff's employment and would therefore be an 'employment contract' by any reasonable

17

understanding," and thus cannot be enforced in light of the apparently contradictory language disclaiming the existence of an "employment contract."  (Pl. Br. at 5.)

Plaintiff's argument lacks merit.  As a general matter, limitations periods are subject to contractual shortening, as long as there is no controlling statute to preclude it and the shorter period is reasonable.  Order of United Commercial Travelers of Am. v. Wolfe, 331 U.S. 586, 608 (1947).  The Employment Application states that the SOL Waiver is to be governed by Illinois law.  (Employment Application at ¶ 13.) Illinois courts have rejected the argument put forth by Plaintiff that the SOL Waiver is unenforceable because the Employment Application is not a valid employment agreement, and found that an agreement in an employment application to shorten a limitations period is binding.  See Ravenscraft v. BNP Media, Inc., No. 09-6617, 2010 WL 1541455, at *2 (N.D. Ill. Apr. 15, 2010) (finding limitations period contractually shortened to six months to be enforceable).  As a matter of contract law, such a waiver provision is enforceable in an employment contract if offer, acceptance, and consideration are all present.  Id. (citing Sheller by Sheller v. Frank's Nursery & Carpets, Inc., 957 F.Supp. 150, 154 (N.D. Ill. 1997)).  In this situation, as in Sheller and Ravenscraft, "the issue . . . is not whether the employment application qualifies as an employment contract, but

18

whether the application qualifies as a valid contract" in and of itself.  Id.  The Employment Application constitutes a contract "because defendant agreed to consider plaintiff for employment if plaintiff, upon employment, agreed to abide by the company rules-including the agreement to shorten the limitations period." Id.  Because acceptance of the SOL Waiver was a condition to being considered for employment at AT&T, Plaintiff is bound by that waiver.

The SOL Waiver, by its terms, does not apply to "EEOC claims," but does shorten the limitations period for claims under "any state or local law governing employment, compensation, discrimination, or retaliation," which the parties do not dispute encompasses the NJLAD.  (Defs. Br. at 4-5.)  The NJLAD itself does not prohibit shortening of the two-year limitations period. See Pyo v. Wicked Fashions, Inc., No. 09-2422, 2010 WL 1380982, at *10 (D.N.J. Mar. 31, 2010) (enforcing contractual one-year limitations period for claims brought against employer, including NJLAD claims).  Moreover, we find no basis in the record for Plaintiff's position that Plaintiff's offer letter superseded the Employment Application and specifically the SOL Waiver.  (Pl. Br. at 6-8.)  Plaintiff cites to language stating, "Any representations regarding the terms and conditions of your employment not contained in this offer letter, including your at-will employment status, are no longer effective."  (Rosenblatt

19

Cert., Ex. B, 9-25-08 Offer Letter at 2360; Pl. Br. at 7.)   The
SOL Waiver is not a representation regarding terms and conditions
of Plaintiff's employment, and thus the offer letter does not
render it unenforceable.   (See Pl. Br. at 4 (stating that the
Employment Agreement and SOL Waiver are not "indicated to be a
condition of employment").)

     The latest date on which Plaintiff's NJLAD claims would have
accrued is September 2, 2008, the day she resigned her
employment.   Plaintiff first asserted her NJLAD claims by filing
the Complaint in this action on June 18, 2010.   (Dkt. entry no.
1, Compl.)   Accordingly, Plaintiff's NJLAD claims, asserted in
the Complaint as Count II, Count III, and Count IV, are time-
barred, and judgment will be entered in favor of Defendants on
those claims.

## III. Americans with Disabilities Act

     Count I of the Complaint seeks relief under the ADA.
(Compl. at ¶¶ 47-50.)   The ADA prohibits discrimination "against
a qualified individual on the basis of disability in regard to
job application procedures, the hiring, advancement, or discharge
of employees, employee compensation, job training, and other
terms, conditions, and privileges of employment."   42 U.S.C. §
12112(a).   A "qualified individual" is defined as "an individual
who, with or without reasonable accommodation, can perform the
essential functions of the employment position that such

20

individual holds or desires." Id. at § 12111(8).  "Reasonable accommodation" includes "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." Id. at § 12111(9).

Under the controlling legal standard at the time of Plaintiff's employment, it is not sufficient for an ADA plaintiff to merely allege some impairment. See Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002) ("Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity. . . . [and that] the limitation on the major life activity is 'substantial.'") (citing 42 U.S.C. § 12102(2)(A) (1994 ed.)).[3]  "It is insufficient for individuals attempting to

---

[3] The ADA Amendments Act of 2008 was enacted on September 25, 2008, with the express purpose of overruling the Supreme Court's holding in Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002), insofar as that case interpreted the term "substantially limits" to require "a greater degree of limitation than was intended by Congress."  Pub. L. No. 110-325, 122 Stat. 3553 (2008).  The new law took effect on January 1, 2009.  Id.  The Third Circuit Court of Appeals has determined that the ADA Amendments Act of 2008 does not apply retroactively.  Kania v. Potter, 358 Fed.Appx. 338, 341 & n.5 (3d Cir. 2009).

prove disability status [under the ADA] . . . to merely submit evidence of a medical diagnosis of an impairment." Pritchett v. Ellers, 324 Fed.Appx. 157, 159 (3d Cir. 2009) (citing Williams, 534 U.S. at 198); see also Johnson v. Amtrak, 390 Fed.Appx. 109, 113 & n.10 (3d Cir. 2010) (rejecting ADA plaintiff's contention that "[h]e can be regarded as being disabled if he has a record of such impairment").

Plaintiff, to establish a prima facie case of discrimination under the ADA, must show that she (1) is a disabled person within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) has suffered an otherwise adverse employment discrimination as a result of discrimination. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). Prior to the 2008 amendments to the ADA, "disability" was defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." Id. (emphasis added); see also 42 U.S.C. § 12102, Historical and Statutory Notes, Amendments. "Under the pre-Amendment standard, the United States Supreme Court stated that 'major life activities' and 'substantial limitation' must be 'interpreted strictly to create a demanding standard for qualifying as disabled.'" Mastrolia v.

22

Potter, No. 08-5967, 2010 WL 1752531, at *4 (D.N.J. Apr. 27, 2010) (quoting Toyota, 534 U.S. at 197).

The record does not provide support for a finding that Plaintiff's impairment was sufficiently "substantial" to bring her within the ADA's protections.  Plaintiff's diagnoses of psoriatic arthritis and pustular psoriasis are not in dispute. Her doctors' records indicate that after Plaintiff used crutches for six weeks (during which time she telecommuted), her right knee occasionally required aspiration of the swelling but did not cause Plaintiff more than mild pain.  (Rosenblatt Cert., Exs. H, I, L.)  Plaintiff did not need crutches after this six-week period, as use of the crutches as prescribed had improved both her knee and foot impairments.  (Pl. Dep. at 123:14-25.)  To the extent Plaintiff felt knee pain, due to walking or otherwise, she was able to eliminate it with a dose of Motrin.  (Pl. Dep. at 106:10-18.)

Plaintiff stated repeatedly that her various requests for telecommuting privileges were motivated by a desire to save time and be efficient, not because Plaintiff was physically unable to walk the distance from the Bedminster facility's parking lot to her desk inside the building.  (Pl. Dep. at at 79:1-5, 169:18-24, 182:19:24, 183:22-185:12.)  When she worked at the office, Plaintiff voluntarily parked her car "far in the parking lot because [she] didn't want her car to get banged up."  (Pl. Dep.

at 26:5-15.)  She testified that, other than during the four-week period for which she had received permission to telecommute at her doctor's recommendation, her knee condition did not affect her ability to come into the office.  (Pl. Dep. at 75:19-76:20.)

It is undisputed that Plaintiff telecommuted before, during, and after the period during which her doctor prescribed the use of crutches so that the suspected stress fracture could heal, the latter period being with Smith's permission and pursuant to a doctor's note for four weeks beginning June 10, 2008.  (Rosenblatt Cert., Ex. K, Email from Gavin to Smith and Dr. Bouillon Note (stating that Plaintiff "will be able to return to work in approximately 4 wks."); Pl. Dep. at 145:16-146:13.)[4] It is also evident from the record that after that time, her doctor observed that she "does not complain of pain" and that Plaintiff's "gait is normal" and the knee had a "good range of motion."  (Bouillon 5-12-08 Progress Note; see also Bouillon 6-5-08 Progress Note ("She really has no pain as such. . . . Range of motion is maintained.  No instability.  She really has no mechanical or meniscal symptoms either.").)  At the outset of her four-week approved telecommuting period, her rheumatologist noted that Plaintiff "has only mild pain and does not have major stiffness."  (6-11-08 Letter from Golombek to Bouillon.)  As of

---

[4] Legally, we are unconcerned with any alleged discrimination prior to June 10, 2008, as it is undisputed that Smith had no knowledge of Plaintiff's alleged disability until that date, and Bradley not until July 29, 2008.

July 1, 2008, when she had been cleared by her doctor to return

to work, her doctor observed:  "She is feeling better with

occasional discomfort in her knee.  Examination of the right knee

today showed no effusion.  Good range of motion."  (Bouillon 7-1-

08 Progress Note.)

The undisputed references in the record to "mild pain,"

"good range of motion," and "normal gait," as well as Plaintiff's

testimony that despite the impairment, she was "still able to

walk," preclude a finding that Plaintiff was <u>substantially</u>

impaired in the major life activity of walking, so as to be

considered "disabled" for purposes of the ADA.  (Pl. Dep. at

104:10-17.)  <u>See</u> <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105-08 (3d

Cir. 1996) (finding that plaintiff diagnosed with "severe

problems with his right hip joint," including degenerative joint

disease that caused him "great difficulty in walking around" with

a limp, was not "disabled" where evidence showed that plaintiff

had trouble walking up stairs, could not walk far distances, but

did not require any special devices like a cane or crutches to

aid him in walking); <u>see also</u> <u>Fredricksen v. United Parcel Serv.,</u>

<u>Co.</u>, 581 F.3d 516, 521-22 (7th Cir. 2009) (finding plaintiff who

suffered from leukemia and had testified that he was unable to

walk "for the same period of time or in the same way" as a

"normal individual" because of muscle and joint fatigued not

"disabled" under the ADA because he conceded that "at all times

he was able to perform the essential functions of his job as an aircraft mechanic," he "never missed work because of difficulty walking," such that court could not conclude that evidence "demonstrates anything more than a moderate limitation on walking").  Plaintiff testified that her knee would start bothering her if she walked on it for "a while," ten to fifteen minutes.  (Pl. Dep. at 110:13-21.)  This is not a substantial impairment.  See Vandeveer v. Fort James Corp., 192 F.Supp.2d 918, 936 (E.D. Wis. 2002) ("[A]lthough walking is a major life activity, people are not often called on to walk for lengthy periods of time and the inability to do so for more than fifteen minutes is not likely a 'substantial limitation.'"); see also Johnson, 390 Fed.Appx. at 114 (finding no substantial impairment where plaintiff was "capable of walking, at least short distances, to restaurants and restrooms").

Plaintiff's pustular psoriasis also does not constitute a substantial limitation on the major life activity of walking. The evidence discussed above regarding Plaintiff's ability to walk applies to this impairment as well.  The Court further observes that Plaintiff testified that: (1) the condition was starting to clear up at the time of her resignation from AT&T; (2) she would "still walk on it" even when the condition flared up "if she had to go somewhere"; (3) she never obtained any kind of doctor's note regarding problems she was having with her foot;

(4) she went to a salon "all the time" for manicure appointments and got pedicures once a month; and (5) no doctor ever told her that she could not do her job in the office because of anything having to do with her foot.  (Pl. Dep. at 129:21-130:3, 131:8-18, 133:6-19, 189:17-191:24, 76:21-24.)

Because Plaintiff has not shown that she is a disabled person within the meaning of the ADA, she fails to rebut Defendants' showing of entitlement to judgment in their favor. We will not address the remaining elements, and judgment will be entered in favor of Defendants on the ADA claim.

## CONCLUSION

For the reasons stated _supra_, the Court will grant summary judgment in favor of Defendants.  The Court will issue an appropriate Order and Judgment.


          s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:   June 11, 2012